[Civ. No. 40674. Second Dist., Div. Five. Sept. 28, 1973.]

In re the Marriage of RITA G. and JOHN J. FORTIER.
RITA G. FORTIER, Appellant, v.
JOHN J. FORTIER, Respondent.

## COUNSEL

Jack R. Tyrell for Appellant.

Millikan, Montgomery & Olafson and C. E. Millikan, Jr., for Respondent.

## OPINION

**STEPHENS, J.**—This is an appeal from an interlocutory judgment of dissolution of marriage. (Code Civ. Proc., § 904.1, subd. (j).)

In brief, appellant wife and respondent husband were married in Michigan in 1952. At the time of the marriage, Dr. Fortier had just graduated from medical school and was a resident physician in Michigan for approximately one year thereafter. Mrs. Fortier worked as a choral music supervisor in Detroit and then as a public relations personnel employee for American Blower Corporation. They moved to Colorado, where the doctor was a resident doctor at Colorado State Hospital and his spouse worked as a teacher in junior high school, and then in a real estate office. When the couple moved to Springville, California, the doctor had a residency occupation for two years and Mrs. Fortier worked as a switchboard relief operator at the hospital and did some technical typing for the director of the hospital; she also directed a junior youth group for the local church, as well as giving piano lessons. The doctor served two years in the Army Medical Corps and was stationed at the Denver Fitzsimmons Army Hospital. In 1958, the Fortiers returned to California and the doctor entered private practice as an internist in Alhambra, in association with another doctor. Mrs. Fortier worked as a bookkeeper full time in the medical office for a few months and part-time thereafter for some eight years. In about 1965, the associate relationship under which Dr. Fortier had practiced terminated due to the retirement of the other doctor, and at that time Dr. Fortier purchased all of the interest in the equipment as well as the goodwill of his associate.[1] Dr. Fortier (hereinafter, respondent) thereafter worked at his medical practice until, by a written partnership agreement dated January 17, 1969, he was joined by a Dr. Cifarelli.

On July 14, 1969, Mrs. Fortier (hereinafter, appellant) instituted proceedings for dissolution of marriage. On September 21, 1971, the trial court entered an interlocutory judgment of dissolution which, among other things, awarded to appellant the custody of the couple's three children,

---

[1]Dr. Fortier testified: "In asking me to buy him out, he says, 'I have all this equipment here, you know, furniture, chairs, and everything that went into this 2,200 square feet of office,' and he said, 'Give me $5,000 and the whole thing is yours,' and that is what we did. Q. In your opinion, was that the value of the physical equipment? A. It was perhaps worth a little bit less than that, I would say. Q. How much less? A. Oh, perhaps 2,500 to 3,000. Q. That is what it was worth or that is what it was worth less? A. Well, if you say 5,000, of that 5,000, I would say that the equipment in there was perhaps in the nature of $2,500 worth, perhaps 3,000. Q. What was the other 2,000 or 2,500 for? A. Well, you might say that was for the introduction, goodwill, although we didn't thrash the point. I did not argue with him. I was very pleased to have been introduced there."

ordered respondent to pay certain amounts of spousal and child support, and evaluated and divided the community property. In particular, the trial court made a finding of fact that the goodwill of respondent's medical practice was a community property asset and fixed the value of that goodwill at $10,963.

On appeal, appellant's sole contention is that the trial court used an incorrect method of evaluating the goodwill of respondent's medical practice and as a consequence erroneously undervalued the couple's community property by approximately $284,000, and that there was no evidence to support the judgment as rendered. We disagree.

The trial court explained its method of evaluating the goodwill in its memorandum of intended decision: "The medical practice involved in this case had good will which is a valuable asset. To the court the value of this asset is its market value; what a willing buyer would pay for it. I cannot believe the goodwill of a medical practice upon divorce means one thing, and upon a sale of the business means another. . . . [¶] In this case the court feels the value of the goodwill was established when Dr. Cifarelli became a partner of [respondent]. . . . They dealt at arm's length and agreed on an amount that Dr. Cifarelli would forego for a period of time before he became an equal partner.[2] That amount was $10,963 which the court finds to be the value of the goodwill of this business."

Appellant argues, however, that market value was not the correct method of evaluating the goodwill. Appellant argues that the goodwill should have been measured by any one of the following three different methods employed by her expert witness, one William Eager: (1) if respondent's net yearly income is greater than the net yearly income of like professional practices, then goodwill is: 10 X (respondent's net yearly income—the net yearly income of a like professional practice); (2) goodwill is 4 X (respondent's net yearly income); (3) if respondent's net yearly income is greater than the net yearly income of like professional practices, then goodwill is equivalent to an amount of principal that, when returned at 8 percent interest over a period of time equivalent to the actuarial remainder of respondent's professional career, would create monthly returns of principal and interest in an amount equivalent to the difference between respondent's net monthly income and the net monthly income of a like professional practice. Eager testified at trial that his first method showed respondent's

---

[2]By the terms of the partnership agreement, respondent was to "participate in the profits and losses of the partnership business to the extent of 60% and Cifarelli [was to] participate to the extent of 40% until January 1, 1970, after which time the partners [were to] share equally in profits and losses."

goodwill to be $293,000, his second method showed respondent's goodwill to be $290,000, and his third method showed respondent's goodwill to be $300,000. From this, appellant argues that the actual goodwill of respondent's practice is the average of these three figures, $294,333.

■ In considering appellant's arguments, we note preliminarily that the goodwill of respondent's medical practice was, in fact, community property. (*Todd* v. *Todd*, 272 Cal.App.2d 786, 791-794 [78 Cal.Rptr. 131]; *Golden* v. *Golden*, 270 Cal.App.2d 401, 404-405 [75 Cal.Rptr. 735]; cf. *Brawman* v. *Brawman*, 199 Cal.App.2d 876, 877, 882 [19 Cal.Rptr. 106].) The difficulty with each of appellant's methods of evaluating that goodwill, however, is that the future income controls in each method valuing the goodwill. Since the philosophy of the community property system is that a community interest can be acquired only during the time of the marriage, it would then be inconsistent with that philosophy to assign to any community interest the value of the post-marital efforts of either spouse.[3] It must be recognized that the value of the goodwill must exist at the time of the dissolution. That value is separate and apart from the expectation of the spouses' future earnings. As we analyze the determination of the existent value of the goodwill applicable in dissolution of marriage actions, that value must be established without dependence upon the potential or continuing net income of the selling doctor. ■ Certainly, where there has been an arm's length sale of such interest (goodwill) and there is no showing of collusion or unfair dealing to the detriment of any interested party, the price paid can be said to be persuasive evidence of the value of that goodwill.

■ ■ Therefore, since community goodwill may be evaluated by no method that is dependent upon the post-marital efforts of either spouse, then, as a consequence, the value of community goodwill is simply the market value at which the goodwill could be sold upon dissolution of the marriage, taking into consideration the expectancy of the continuity of the practice.

We have examined each of the cases cited by appellant, and though the early cases of *Fritschi* v. *Teed*, 213 Cal.App.2d 718 [29 Cal.Rptr. 114], *Brawman* v. *Brawman, supra*, 199 Cal.App.2d 876, and *Mueller* v. *Muel-*

---

[3]Our opinion is limited to the evaluation of professional goodwill as a community property asset, and we express no opinion as to whether appellant's evaluation methods may or may not be legitimate accounting tools for evaluating professional goodwill for other, non-community-property purposes.

*ler,* 144 Cal.App.2d 245 [301 P.2d 90] can be readily distinguished (as can *Todd* v. *Todd, supra,* 272 Cal.App.2d 786), we feel constrained to accept the holding in *Golden* v. *Golden, supra,* 270 Cal.App.2d 401, 405,[4] which opinion emanated from this district and was authored by a recognized authority in the field of community property. We note, however, that in that case no formula was set forth. The problem before us, then, is not whether some formula which was suggested but not accepted by the court *could have been* accepted as a proper means of arriving at the value of the goodwill, but rather: was the formula which the court applied a proper one, and is there evidence to support the court's decision. ■ While it is argued that there is *no* evidentiary support for the formula and figure utilized by the court in the instant case, we disagree. An examination of *Mueller, supra,* shows that the court there recognized that where the professional person "acquired" his initial interest in the business by a purchase, some or all of which was to cover "goodwill," that could establish a "purchase and sales" formula and value. The identical situation is present in the instant case. Here, respondent "purchased" his associate's interest in 1965 and paid for what he described as goodwill.[5] It is illogical to say that in 1969, when he sold a like interest to his new partner, nothing was paid for goodwill.[6] Whether a "silent partner" reference or "sales" reference is used in the instant case, both contemplated respondent's continuing to work. The court heard the value estimates of the experts and parties, which ranged from nothing to $300,000. Certainly, it cannot be said that where respondent was willing to pay, and did pay, between $2,500 and $3,000

---

[4]"We believe the better rule is that, in a divorce case, the good will of the husband's professional practice as a sole practitioner should be taken into consideration in determining the award to the wife. Where, as in *Lyon* [v. *Lyon,* 246 Cal.App.2d 519 (54 Cal.Rptr. 829)], the firm is being dissolved, it is understandable that a court cannot determine what, if any, of the good will of the firm will go to either partner. But, in a matrimonial matter, the practice of the sole practitioner husband will continue, with the same intangible value as it had during the marriage. Under the principles of community property law, the wife, by virtue of her position of wife, made to that value the same contribution as does a wife to any of the husband's earnings and accumulations during marriage. She is as much entitled to be recompensed for that contribution as if it were represented by the increased value of stock in a family business."

[5]It is argued that the contract of purchase between respondent and Dr. Cifarelli indicated that no value was attached to the goodwill aspect of the business for it provided that at the time of dissolution of that partnership no value would be assigned to goodwill. Our reading of that contract leads us to believe that its reference to goodwill relates solely to future eventualities.

[6]The testimony by respondent to the effect that in 1969 no value was placed on goodwill is not binding upon the court when the existence of goodwill at that time is acknowledged and the purchase price was over and above the physical property value.

for the goodwill in 1965 there was no evidence to support the court's conclusion that $10,963 was not reasonable.

The judgment is affirmed.

Kaus, P. J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 21, 1973.